UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
RAYMOND ZUCARO and SANTIAGO CUNEO,                                :
                                                                  :
                        Plaintiffs,                               :
                                                                  :   21 Civ. 8775 (JPC)
         -v-                                                      :
                                                                  :   OPINION AND ORDER
                                                                  :
ROBERT VENABLE,                                                   :
                                                                  :
                        Defendant.                                :
                                                                  :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Plaintiffs Raymond Zucaro and Santiago Cuneo brought this suit against Defendant Robert Venable for unjust enrichment[1] and quantum meruit, seeking funds currently held in escrow that were paid to the parties back in 2015 to settle claims against their former business partner. For years, the parties have been attempting to allocate those funds among each other, and even engaged in arbitration only for the arbitrator to hold that "there is no means by which a court – or an arbitrator – may impose any particular allocation on the parties." Dkt. 3-2 ("Arbitration Decision") at 32. Defendant has moved to dismiss, arguing, *inter alia*, claim preclusion based on that prior arbitration. The Court agrees, and grants Defendant's motion.

---

[1] While Plaintiffs refer to Count 1 as a claim for "restitution," *see* Dkt. 3 ("Compl.") at 8, the Court construes this claim as one for unjust enrichment.

# I. Background

A. Facts[2]

The relevant background to this matter is more fully recounted in the thoughtful and thorough Final Interim Decision of Justice Nickolas J. Dibiaso (Ret.), Court of Appeal of California, Fifth District, in the parties' arbitration proceedings. *See* Dkt. 3-2 ("Arbitration Decision") at 2-19. In short, back in 2014, a dispute arose between the parties to this litigation (the "Parties") on one side, and their former business partner, David Hinman, on the other. *Id.* at 3. Among other things, Hinman had discussed leaving their firm, SW Asset Management, LLC ("SW"), and taking several clients with him, including SW's largest client, Forward/Salient. *Id.*; *accord id.* at 2 n.2. In 2015, the Parties engaged joint counsel and began negotiating a settlement agreement with Hinman and Forward/Salient. *Id.* at 3-5. But during those negotiations, an internal dispute arose as to how the Parties would split any settlement proceeds. *Id.* at 5-8. Zucaro believed that he should be given a larger share of the payment, since his "equity interest in the firm was 'larger' than Venable's" and because he had made a large capital contribution to start SW. *Id.* at 7; *accord id.* at 18 (similar). "Cuneo had agreed to do whatever Zucaro decided . . . ." *Id.* at 4 (internal quotation marks and brackets omitted). Defendant, *i.e.*, Venable, noting that he had foregone a salary in the early years of SW, believed that he and Zucaro should be entitled to roughly equal shares of the payment. *Id.* at 6-7; *see also id.* at 11.

---

[2] The following facts are taken from the Complaint, Dkt. 3 ("Compl."), as well as the exhibits attached thereto, and are assumed as true for the purposes of this Opinion and Order. *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[O]n a motion to dismiss, a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference . . . ." (internal quotation marks omitted)).

Facing pressure from Forward/Salient, which sought to reach a settlement quickly, *id.* at 8-9, the Parties were recommended by counsel to "[p]ut the proceeds in escrow" and to "deal with" the allocation "after closing," since any "public discord" among the Parties could jeopardize the deal, *id.* at 12. It appears that this arrangement appealed at least to Defendant because, in part, he did not wish the Parties to disclose to Forward/Salient the exact terms of the allocation. *See id.* at 13. On June 9, 2015, *id.* at 15, the Parties, SW, two other SW corporate entities, Forward/Salient, and Hinman executed a finalized settlement agreement containing the following provision:

> [Forward/Salient] shall . . . pay, or cause to be paid, to the [Parties]: (i) at the Closing, cash in immediately available funds in [a certain amount], which amount shall be allocated among the [Parties] in a manner in which they shall mutually agree in writing . . . and (ii) additional cash in the amount of One Million Dollars ($1,000,000) to be paid in quarterly installments of Two Hundred Fifty Thousand Dollars ($250,000) each, on each of September 1, 2015, December 1, 2015, March 1, 2016, and June 1, 2016 . . . .

Compl., Exh. C ("Settlement Agreement") § 2.5(a).[3]

After executing the Settlement Agreement, however, the Parties were still unable to agree on how to allocate roughly $1.12 million of the payment (the "Escrowed Funds"). Arbitration Decision at 18-19. Defendant eventually initiated arbitration proceedings against Plaintiffs, alleging, *inter alia*, breach of contract, breach of the implied covenant of good faith, promissory estoppel, and fraud. *Id.* at 19. Defendant argued that Zucaro had induced him to the sign the Settlement Agreement based on a promise that they would each receive a roughly equal share of

---

[3] The Court previously granted Plaintiffs' request to maintain the Settlement Agreement under seal, and to redact certain portions of the Complaint referencing the Settlement Agreement. Dkt. 6. However, for the purposes of deciding Defendant's motion to dismiss, the Court will discuss and quote from limited sealed portions of the Settlement Agreement, as the probative value of doing so outweighs any prejudice to Plaintiffs, *see, e.g.*, *United States v. Alexandre*, No. 22 Cr. 326 (JPC), 2023 WL 416405, at *1 n.3 (S.D.N.Y. Jan. 26, 2023), particularly given that many of the terms of the Settlement Agreement were disclosed in the Arbitration Decision, which Plaintiffs annexed to the Complaint as an unredacted, publicly filed exhibit.

3

the remaining funds. *Id.* at 19-20 & n.19. Plaintiffs filed an answer in the arbitration with counterclaims against Defendant for breach of fiduciary duty, breach of contract, and breach of the implied covenant of good faith and fair dealing. Dkt. 27-1 ("Arbitration Answer").[4] They alleged that Zucaro founded the firm and was primarily responsible for its successful investment strategies, whereas Defendant was merely "hired to manage and administer the 'back office' business." *Id.* at 3-7. They further characterized the Settlement Agreement as a "sale of all or substantially all of the assets of SW" to Forward/Salient, and the Escrowed Funds as "commercial assets belonging to SW, and not the personal assets of" SW's shareholders, including the Parties. *Id.* at 12. And thus, Plaintiffs argued that the Escrowed Funds should be allocated based on equity ownership, "in accordance with the SW's Operating Agreement," and that the Escrowed Funds "remain[] frozen . . . due to the obstruction and interference of [Defendant]." *Id.* at 13, 16; *see also* Arbitration Decision at 21. As relief, Plaintiffs sought an order determining that the Escrowed Funds be divided based on equity percentage in SW, with a majority of the funds going to Zucaro. Arbitration Answer at 48-49.

After a three-day hearing, on August 27, 2017, Justice Dibiaso issued the Final Interim Decision rejecting each side's claims. *See* Arbitration Decision at 1, 22, 31-32. In rejecting Plaintiffs' claims, Justice Dibiaso specifically analyzed section 2.5 of the Settlement Agreement. *Id.* at 31-32. He reasoned that the provision requiring that the Escrowed Funds "shall be allocated among the [Parties] in a manner in which they shall mutually agree in writing," Settlement Agreement § 2.5(a), was either "an enforceable contract to negotiate," in which case "the obvious

---

[4] Pursuant to Defendant's unopposed request, Dkt. 26, the Court takes judicial notice of the Arbitration Answer. *See, e.g.*, *Malkin v. Shasha*, No. 20 Civ. 9874 (AT), 2021 WL 3408575, at *2 (S.D.N.Y. Aug. 4, 2021) ("Materials appropriate for judicial notice [on a motion to dismiss] include arbitration filings.").

mutual intention was that the parties would earnestly negotiate in good faith to attempt to come to a final agreement about how to allocate the [Forward/Salient] payments," or "an unenforceable agreement to agree" in which case "the obvious intention was that the parties would attempt, but would not be required, to negotiate to come to a final agreement about how to allocate the [Forward/Salient] payments." Arbitration Decision at 32. Justice Dibiaso then concluded that "[i]n either instance, there is no means by which a court -- or an arbitrator -- may impose any particular allocations on the parties, whether they fruitlessly negotiated in good faith or fruitlessly failed to agree." *Id.*

On October 13, 2017, Justice Dibiaso issued a Final Award denying all claims, *see* Dkt. 27-3 at 8, and the Honorable Melissa McCormick, California Superior Court, Orange County, entered judgment in conformity with the Final Award on January 2, 2018, *see id.* at 3; *accord* Dkt. 26 at 2. The Parties subsequently agreed to retain Citibank as an escrow agent and to transfer the Escrowed Funds from counsel to Citibank to be held a non-interest-bearing account. Dkt. 3-1 ("Escrow Agreement"), art. 1 ¶ f, Sch. A § I. Consistent with the Settlement Agreement, the Escrow Agreement directs Citibank, upon receipt of "joint written instructions signed by" the Parties, to "disburse the amount of the Escrowed Funds specified in such notice by wire transfer of immediately available funds as directed in such notice." *Id.*, Sch. A § III. The Parties also memorialized the following:

> The Parties recognize that on January 2, 2018, Hon. Melissa McCormick of the Orange County Superior Court . . . entered Judgment in conformity with the [Arbitration Decision], and that nothing changes the content or effectiveness of the judgment and the final award. Notwithstanding the foregoing, for the purposes of this Escrow Agreement and the division of the Escrowed Funds hereunder only, the Parties agree that there are not currently in effect any agreements (whether written or oral, express or implied) that govern the allocation of the Escrowed Funds between the Parties. For the sake of clarity, the agreement documented in the preceding sentences applies only to the Parties to this Escrow Agreement for the purposes of allocation of the Escrowed Funds between the Parties, and this

>  provision has no application to or effect on any rulings in the AAA arbitration proceedings and/or the Orange County Superior Court case referenced above . . . .

*Id.*

**B.     Procedural History**

Plaintiffs initiated the present action on October 27, 2021.  Dkt. 1.  They allege in the Complaint, as they did in the arbitration, *see* Arbitration Answer at 4-6, that Zucaro founded SW and built it into a successful firm, that Defendant joined the firm after it was a going concern, and that his "rank was lower than Zucaro's."  Compl. ¶¶ 13-23 (internal quotation marks omitted).  Plaintiffs further assert, as they also did in arbitration, *see* Arbitration Answer at 1-2, that Defendant "brought the AAA Action to attempt to get his hands on" as much of the Escrowed Funds as possible, and more than he deserved, and that his "meritless litigations and general conduct have dramatically harmed Zucaro" by "forc[ing]" the Parties "to place $1,120,500 at issue in escrow."  Compl. ¶¶ 31-32.  Finally, Plaintiffs seek an order declaring that the Escrowed Funds are Zucaro's property and transferring the funds to him.  *Id.* at 10.

Defendant moved to dismiss on March 25, 2022.  Dkt. 23.  He refiled his motion on April 27, 2022, in order to correct a docketing error.  Dkts. 24, 25 ("Motion"), 26-27; *see also* Mar. 25, 2022 Notice to Attorney to Re-File Document.  Plaintiffs opposed the motion on April 27, 2022, Dkt. 28 ("Opposition"), and Defendant replied on May 13, 2022, Dkt. 29 ("Reply").

## II.  Legal Standard

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

6

*Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although a court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009); *see also Paul Hobbs Imports Inc. v. Verity Wines LLC*, No. 21 Civ. 10597 (JPC), 2023 WL 374120, at *3 (S.D.N.Y. Jan. 24, 2023).

### III.  Discussion

As relevant to this Opinion and Order, Defendant argues that Plaintiffs' claims are barred by the doctrine of claim preclusion since Plaintiffs' claims for equitable relief are premised on the same "primary right" as their unsuccessful claims in arbitration. Motion at 8-11. Plaintiffs argue that claim preclusion is inapplicable because "the parties altered their own relationship subsequent to the [arbitration] by way of the Escrow Agreement." Opposition at 5 (emphasis omitted); *see also id.* at 7-9. The Court first determines whether the arbitration has a preclusive effect on this case, and if so, then whether that preclusive effect is extinguished by the Escrow Agreement.

**A.   Claim Preclusion**

Claim preclusion "operate[s] to prevent parties from contesting matters that they have had a full and fair opportunity to litigate, thereby conserving judicial resources and protecting parties from the expense and vexation of multiple lawsuits." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). As such, "[a] court may consider a [claim preclusion] defense on a Rule 12(b)(6) motion to dismiss when the court's inquiry is limited to the plaintiff's complaint, documents attached or incorporated therein, and materials appropriate for judicial notice." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 498 (2d Cir. 2014). "To determine the effect

7

of a state court judgment, federal courts, including those sitting in diversity, are required to apply the preclusion law of the rendering state." *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 87 (2d Cir. 2000). Here, pursuant to section 6.5 of the Settlement Agreement, *see* Arbitration Decision at 16 (quoting Settlement Agreement § 6.5), Justice Dibiaso applied California law to the Parties' arbitration, *see id.* 20 n.19, 22 & n.21, 23 n.22, 27-32, 28 n.24 (applying California law). Moreover, judgment was entered in conformity with the Final Arbitration Award in Orange County Superior Court. See Dkt. 27-3 at 3. Accordingly, California law determines the preclusive effect of that decision. *See Simmons v. Trans Express Inc.*, 955 F.3d 325, 328 (2d Cir. 2020) ("Because a New York small claims court decided Simmons's previous action, New York law determines the preclusive effect of that judgment.").

Under California law, "[c]laim preclusion prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them." *DKN Holdings LLC v. Faerber*, 352 P.3d 378, 386 (Cal. 2015) (emphasis and internal quotation marks omitted). It applies whenever the "second suit involves (1) the same cause of action (2) between the same parties . . . (3) after a final judgment on the merits in the first suit." *Samara v. Matar*, 419 P.3d 924, 926 (Cal. 2018). Here, the same parties are involved in this suit as in the arbitration, and Orange County Superior Court judgment entered in conformity with the Arbitration Decision constitutes a final judgment on the merits, *see Cal Sierra Dev., Inc. v. George Reed, Inc.*, 223 Cal. Rptr. 3d 506, 519 (Ct. App. 2017) ("A judgment confirming the arbitration award constitutes a final judgment on the merits.").

In this case, Plaintiffs bring claims for unjust enrichment and quantum meruit, whereas in the arbitration, they counterclaimed for breach of fiduciary duty, breach of contract, and breach of the covenant of good faith and fair dealing. *Compare* Compl. ¶¶ 35-49, *with* Arbitration Answer

8

at 41-47. But under California law, "for purposes of applying the doctrine of [claim preclusion], the phrase 'cause of action' has a more precise meaning: The cause of action is the right to obtain redress for a harm suffered, regardless of the specific remedy sought or the legal theory (common law or statutory) advanced." *Boeken v. Philip Morris USA, Inc.*, 230 P.3d 342, 348 (Cal. 2010). Thus, "[t]o determine whether two proceedings involve identical causes of action for purposes of claim preclusion, California courts have consistently applied the primary rights theory." *Id.* (internal quotation marks omitted). The primary rights theory is "a theory of code pleading that has long been followed in California. It provides that a cause of action is comprised of a primary right of the plaintiff, a corresponding primary duty of the defendant, and a wrongful act by the defendant constituting a breach of that duty." *Mycogen Corp. v. Monsanto Co.*, 51 P.3d 297, 306 (Cal. 2002). "A primary right is the right to be free of a particular injury." *Cal Sierra Dev., Inc.*, 223 Cal. Rptr. 3d at 517. "Although different grounds for legal relief may be asserted under different theories, conduct that violates a single primary right gives rise to only one cause of action." *DKN Holdings LLC*, 352 P.3d at 382 n.1.

Plaintiffs' counterclaims in the arbitration for breach of contract, fiduciary duty, and the covenant of good faith and fair dealing were based on the same primary right as their current claims for unjust enrichment and quantum meruit: a right to receive a substantial allocation of the Escrowed Funds, based on Zucaro's founding of and larger equity share in SW. Moreover, the suits involved allegations of the same corresponding primary duty of Defendant: the duty not to obstruct Plaintiffs' allocation of the Escrowed Funds or demand more than his fair share. And finally, the suits allege the same "wrongful act by [Defendant] constituting a breach of that duty": causing the funds to be "frozen" in escrow pending the resolution of Defendant's meritless claims to those funds. *Compare* Compl. ¶ 7, *with* Arbitration Answer at 16. Thus, even though Plaintiffs

have styled their suit with different legal theories, they are seeking entitlement to the same Escrowed Funds as they were during the arbitration, based on the same alleged conduct of Defendant. In other words, the harm that Plaintiffs complain of here—being deprived of the Escrowed Funds—is the same as in the arbitration. *See Boeken*, 230 P.3d at 348 ("[U]nder the primary rights theory, the determinative factor is the harm suffered. When two actions involving the same parties seek compensation for the same harm, they generally involve the same primary right."); *see also Delta Aliraq, Inc v. Martin*, No. EDCV 16-643 (JGB) (SPx), 2017 WL 11615775, at *8 (C. D. Cal. Aug. 4, 2017) ("Plaintiff's claims here and in [the prior suit] assert the same primary right: they are directed at the same conduct, they seek recovery of the same payments, and the facts in this case largely mirror those alleged in [the prior case]."). And in fact, Plaintiffs' prayers for relief in both the Arbitration Answer and the Complaint seek an order determining that Zucaro is entitled to a specific allocation of the Escrowed Funds. *Compare* Arbitration Answer at 48, *with* Compl. at 10; *cf. Mycogen Corp.*, 51 P.3d at 307-09 (successive suit for breach of the same contract involved the same primary right as the first suit even though the requested remedy in the first suit was specific performance whereas the second suit sought damages). Accordingly, this suit, in which Plaintiffs seek entitlement to the Escrowed Funds, as they did in the arbitration, involves the same primary right as Plaintiffs' counterclaims in the arbitration such that claim preclusion applies.

**B.     Changed Circumstances**

Plaintiffs do not seriously dispute that the present action involves the same primary right as the arbitration. Instead, they argue that claim preclusion is inapplicable because the Parties "conclusively modified their relationship with one another by way of the . . . Escrow Agreement." Opposition at 8. Specifically, Plaintiffs reason that the arbitration concerned the Parties' rights

under the Settlement Agreement and that Justice Dibiaso concluded that the Settlement Agreement "was an agreement among the parties to 'agree to agree' or 'agree to negotiate,'" leading to his conclusion that "there is no way any arbitrator or judge could divvy up the funds at issue." *Id.* However, Plaintiffs assert that the Parties have since "unbound themselves" from the Settlement Agreement, and therefore also from the Arbitration Decision, when they entered into the Escrow Agreement. *Id.* Specifically, they rely on Escrow Agreement's provision that "the Parties agree that there are not currently in effect any agreements (whether written or oral, express or implied) that govern the allocation of the Escrowed Funds between the Parties." *Id.* at 4 (emphasis omitted) (quoting Escrow Agreement, Sch. A § III). Plaintiffs insist that this provision is an agreement "that, at a time after the arbitration, there was not an agreement to agree . . . or an agreement to negotiate." *Id.* Accordingly, while the Escrow Agreement does not "change or otherwise modify the [arbitration's] resolution[, i]t instead amounted to an agreement that nothing governed the distribution of the deadlocked funds as of August 3, 2018," thereby "modif[ying] the parties' legal relationship after the conclusion of the" arbitration and allowing Plaintiffs' new causes of action. *Id.* at 8-9; *see id.* at 4.

Defendant disagrees. He argues that the Escrow Agreement's language that "there are not currently in effect any agreements . . . that govern the allocation of the Escrowed Funds" merely confirms Justice Dibiaso's holding. Reply at 3-4. Accordingly, Defendant argues, because the Escrow Agreement, like the Settlement Agreement, requires that the funds be distributed only when the Parties present Citibank with written instructions as to the allocation signed by all Parties, and so the legal rights of the Parties have remained the same. *Id.*

Plaintiffs are correct that claim preclusion "was never intended to operate so as to prevent a re-examination of the same question between the same parties where, in the interval between the

11

first and second actions, the facts have materially changed or new facts have occurred which may have altered the legal rights or relations of the litigants." *Evans v. Celotex Corp.*, 238 Cal. Rptr. 259, 262 (Ct. App. 1987) (quoting *Hurd v. Albert*, 3 P.2d 545, 549 (Cal. 1931)); *see* Opposition at 7. In other words, claim preclusion "extends only to the facts in issue as they existed at the time the judgment was rendered and does not prevent a reexamination of the same questions between the same parties where in the interim the facts have changed or new facts have occurred which may alter the legal rights of the parties." *City of Oakland v. Oakland Police & Fire Ret. Sys.*, 169 Cal. Rptr. 3d 51, 68-69 (Ct. App. 2014) (emphasis omitted) (quoting *Am. Broad. Cos. v. Walter Reade-Sterling, Inc.*, 117 Cal. Rptr. 617, 621 (Ct. App. 1974)). Thus, "[w]hen other facts or conditions intervene before a second suit, furnishing a new basis for the claims and defenses of the respective parties, the issues are no longer the same and the former judgment cannot be pleaded in bar of the second action." *Id.* (emphasis omitted) (quoting *Am. Broad. Cos.*, 117 Cal. Rptr. at 621).

The Escrow Agreement does not in any way change the material facts of this case or otherwise alter the parties' legal relationship. To start, the purpose of an escrow agreement like the one here is to provide a mechanism by which property may be maintained in stasis, on deposit with a third party "*until the occurrence of a condition*, at which time the third party is to hand over the [money] to the promisee." *Escrow*, *Black's Law Dictionary* (11th ed. 2019) (emphasis added). Thus, by its very definition, the mere existence of an escrow agreement, without more, cannot be the "condition" which triggers the agent's duty to hand over the escrowed property. The Court thus examines the terms of the Escrow Agreement to determine whether it materially altered the facts or legal relations of the Parties.

12

The terms of the Settlement Agreement and of the Escrow Agreement are nearly identical. Under the Settlement Agreement, the Escrowed Funds "shall be allocated among [Zucaro, Cuneo, and Venable] in a manner in which they shall mutually agree in writing." Settlement Agreement § 2.5(a). Similarly, under the Escrow Agreement, Citibank "shall retain the Escrowed Funds in the Escrow Account until it is presented with joint written instructions signed by [the Parties]." Escrow Agreement, Sch. A § III.[5] Thus, even if, as a technical matter, the Escrow Agreement now governs the distribution of the Escrowed Funds, whereas at the time of arbitration the distribution of the Escrowed Funds was governed by the Settlement Agreement, under both agreements the funds may be distributed only pursuant to allocation instructions signed by each of the parties. As such, Justice Dibiaso's holding that "there is no means by which a court -- or an arbitrator -- may impose any particular allocations on the parties" under the Settlement Agreement, Arbitration Decision at 32, applies with equal force following the Parties' execution of the Escrow Agreement. *See Price v. Sixth Dist. Agric. Ass'n*, 258 P. 387, 389-90 (Cal. 1927) ("[I]t is undisputed that the latter contract is but a recast of the former and that the subject-matter covered by the two contracts is the same. . . . We have no hesitancy, therefore, in concluding that the causes of action are substantially the same and that [claim preclusion] is applicable, provided as always that the parties are identical."); *City of Oakland*, 169 Cal. Rptr. 3d at 66-70 (holding claim preclusion barred Oakland from relitigating whether its police officers could receive retirement benefits based on holiday premium pay, even though the details of the officers' compensation were governed by successive salary ordinances and memoranda of understanding at the time of the second suit); *cf.*

---

[5] Unlike the Settlement Agreement, the Escrow Agreement contains a provision that "upon receiving satisfactory proof of the death of any of [the Parties], Escrow Agent may disburse funds once presented with joint written instructions signed by the surviving parties." Escrow Agreement, Sch. A § III. This difference does not alter Justice Dibiaso's holding that the allocation of the funds is nonjusticiable; nor is it applicable since all of the Parties are still currently living.

*Rynsburger v. Dairymen's Fertilizer Coop., Inc.*, 72 Cal. Rptr. 102, 107-08 (Ct. App. 1968) (holding that claim preclusion "should not be defeated by minor differences of form, parties, or allegations, when these are contrived only to obscure the real purpose—a second trial on the same cause between the same parties" (internal quotation marks omitted)).

Also unpersuasive is Plaintiffs' argument that they are somehow no longer bound by the Arbitration Decision based on the language of the Escrow Agreement. *See* Opposition at 8-9. The plain text of that Escrow Agreement reflects otherwise and indicates that the parties remain bound by the Arbitration Decision. The paragraph of the Escrow Agreement upon which Plaintiffs rely begins by reaffirming the prior arbitration proceedings, emphasizing that the agreement in no way "changes the content or effectiveness of the judgment and the final award." Escrow Agreement, Sch. A § III ("The Parties recognize that on January 2, 2018, Hon. Melissa McCormick of the Orange County Superior Court . . . entered Judgment in conformity with the Record of Proceedings and Final Award issued on October 13, 2017, by Hon. Nickolas J. Dibiaso (Ret.) . . . and that nothing changes the content or effectiveness of the judgment and the final award."). It then continues: "Notwithstanding the foregoing, for the purposes of this Escrow Agreement and the division of the Escrowed Funds hereunder only, the Parties agree that there are not currently in effect any agreements (whether written or oral, express or implied) that govern the allocation of the Escrowed Funds between the Parties." *Id.* That sentence recognizes that *notwithstanding* the Arbitration Decision—meaning, *to the extent* the Arbitration Decision suggests otherwise—there are no agreements governing the disbursement of the funds. *See Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.*, 973 N.Y.S.2d 187, 192 (App. Div. 2013) ("In construing statutes and contracts . . . the use of a notwithstanding clause clearly signals the drafter's intention that the provision of the notwithstanding section override conflicting provisions of any other section."

14

(internal quotation marks and ellipsis omitted));[6] *see also N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 301-03 (2017) (discussing a "notwithstanding clause"); *id.* at 301 ("The ordinary meaning of 'notwithstanding' is 'in spite of,' or 'without prevention or obstruction from or by.'" (citations omitted)). With the Escrow Agreement largely consistent with the Arbitration Decision, the core holding of which is that neither a court nor arbitrator can impose an allocation scheme on the parties, the Escrow Agreement's "notwithstanding" sentence has the effect of disclaiming any of the Parties' prior arguments as to agreements for various allocations of the Escrowed Funds, since many of those arguments are detailed at length in the Arbitration Decision (such as Defendant's argument that Plaintiffs promised him a roughly equal allocation, and Plaintiffs' arguments that the allocation should be based on equity pursuant to the SW operating agreement). *See* Arbitration Decision at 20-21.

Importantly, this provision is also self-limiting. The Escrow Agreement states, "*for the purposes of this Escrow Agreement* and the division of the Escrowed Funds *hereunder only*, the Parties agree that there are not currently in effect any agreements . . . that govern the allocation of the Escrowed Funds." Escrow Agreement, Sch. A § III (emphasis added). In other words, the Parties are agreeing that no agreements govern the Escrowed Funds for the purposes of the Escrow Agreement only. This provision therefore cannot unbind the parties from the Settlement Agreement and the Arbitration Decision because it has no effect outside the four corners of the Escrow Agreement. Indeed, the following sentence explicitly emphasizes "[f]or the sake of clarity" that "the agreement documented in the preceding sentence . . . has no application to or effect on any rulings in the . . . arbitration proceedings and/or the Orange County Superior Court

---

[6] Because the Escrow Agreement provides that it "shall be governed by the law of the State of New York in all respects," Escrow Agreement art. 7, the Court applies New York law to interpret its provisions.

case . . . ." *Id.* This sentence unambiguously refutes any suggestion that the Parties are somehow unbound from the Arbitration Decision by virtue of the Escrow Agreement.[7]

In sum, there is neither a material changed circumstance nor new legal relationship that makes claim preclusion inapplicable. Plaintiffs' claims for unjust enrichment and quantum meruit are therefore barred by the doctrine of claim preclusion and must be dismissed.

## C.  Leave to Amend

Having dismissed Plaintiffs' claims, the Court must consider whether to grant leave to amend. Under Federal Rule of Civil Procedure 15(a)(2), a court "should freely give leave when justice so requires." When deciding whether to grant leave to amend, "courts will consider many factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility." *Morales v. Kimberly-Clark Corp.*, No. 18 Civ. 7401 (NSR), 2020 WL 2766050, at *9 (S.D.N.Y. May 27, 2020) (citation omitted).

Plaintiffs argue, in the alternative, that if the Settlement Agreement's requirement that the Parties "attempt to agree or negotiate" survives the Escrow Agreement, "this portion of the [Settlement] Agreement has indeed become in effective [sic] at some point in the past few years," which would also change the Parties' legal relationship. Opposition at 9. In support, Plaintiffs quote *Copeland v. Baskin Robbins U.S.A.* for the proposition that "[i]f, despite their good faith

---

[7] Even if the Escrow Agreement were to provide that the parties are now unbound from the Settlement Agreement and from Justice Dibiaso's Arbitration Decision—and for reasons discussed, it plainly does not—such a provision would be invalid. The Settlement Agreement states that "[t]his Agreement may only be amended or supplemented by written agreement signed by all of the Parties," Settlement Agreement § 6.1, who include not just Zucaro, Cuneo, and Venable, but also SW, SW Capital Holdings LLC, SW Capital Partners, L.P. Forward/Salient, and Hinman. Settlement Agreement at 1. While the Escrow Agreement was signed by Zucaro, Cuneo, and Venable, it was not signed by Forward/Salient, Hinman, or any of the SW entities. Escrow Agreement at 8-10. Thus, the Escrow Agreement could not have validly amended the Settlement Agreement.

efforts, the parties fail to reach ultimate agreement on the terms in issue the contract to negotiate is deemed performed and the parties are discharged from their obligations." 117 Cal. Rptr. 2d 875, 880 (Ct. App. 2002); *see* Opposition at 9.  The Complaint, however, is devoid of any allegations that Plaintiffs made "good faith efforts" to negotiate an allocation of the Escrowed Funds following the arbitration.  Thus, even if the Settlement Agreement were an enforceable agreement to negotiate, the Parties would still have a duty to attempt to negotiate in good faith under *Copeland*.  However, the Court will give Plaintiffs a chance to amend the Complaint solely for the purpose of pleading facts to demonstrate that the Settlement Agreement was, in fact, an enforceable agreement to negotiate, and that the Parties discharged such a duty prior to filing the instant lawsuit. The Court emphasizes that Plaintiffs should only file an Amended Complaint if they are able to remedy the pleading deficiencies identified herein.[8]

### IV. Conclusion

For the reasons discussed, Defendant's motion to dismiss is granted.  Plaintiffs' two causes of action are dismissed without prejudice.  The Court grants Plaintiffs leave to amend the Complaint.  In the event Plaintiffs decide to file an amended complaint, they must file it within thirty days of this Opinion and Order.  If Plaintiffs fail to file an amended complaint within thirty days, and do not show good cause to excuse the failure to do so, the Court will dismiss this action with prejudice.  The Clerk of Court is respectfully directed to close Docket Number 24.

---

[8] While the Court is unable to consider facts outside the four corners of the Complaint or documents attached to or referenced therein, the Court notes that according to defense counsel in its reply brief, no such post-arbitration negotiations took place.  *See* Reply at 6 ("Plaintiffs do not plead a single allegation suggesting they engaged in any post-arbitration negotiations *(because they did not)*." (emphasis added)).

17

SO ORDERED.

Dated: March 29, 2023
       New York, New York

_____
JOHN P. CRONAN
United States District Judge